# SUPREME COURT OF THE UNITED STATES

### ARTEMUS RICK WALKER *v.* GEORGIA

ON PETITION FOR WRIT OF CERTIORARI TO THE SUPREME
COURT OF GEORGIA

No. 08–5385.   Decided October 20, 2008

JUSTICE THOMAS, concurring in the denial of the petition of certiorari.

Petitioner brutally murdered Lynwood Ray Gresham, and was sentenced to death for his crime.   JUSTICE STEVENS objects to the proportionality review undertaken by the Georgia Supreme Court on direct review of petitioner's capital sentence.   The Georgia Supreme Court, however, afforded petitioner's sentence precisely the same proportionality review endorsed by this Court in *McCleskey* v. *Kemp*, 481 U. S. 279 (1987); *Pulley* v. *Harris*, 465 U. S. 37 (1984); *Zant* v. *Stephens*, 462 U. S. 862 (1983); and *Gregg* v. *Georgia*, 428 U. S. 153 (1976), and described in *Pulley* as a "safeguard against arbitrary or capricious sentencing" additional to that which is constitutionally required, *Pulley*, *supra,* at 45.   Because the Georgia Supreme Court made no error in applying its statutorily required proportionality review in this case, I concur in the denial of certiorari.

In May 1999, petitioner recruited Gary Lee Griffin to help him "rob and kill a rich white man" and "take the money, take the jewels."   Pet. for Cert. 5 (internal quotation marks omitted); 282 Ga. 774, 774–775, 653 S. E. 2d 439, 443, (2007).   Petitioner and Griffin packed two bicycles in a borrowed car, dressed in black, and took a knife and stun gun to Gresham's house.   Petitioner lured Gresham outside, Pet. for Cert. 5, stabbed him 12 times in the chest and back, and dragged him to the side of the house to die, 282 Ga., at 775, 653 S. E. 2d, at 443.   Griffin found Gresham's wallet and house keys and gave the keys

to petitioner, who said he had "'one more to kill.'" *Ibid.* However, because Mrs. Gresham and her daughter had been inside their house and had locked the door with chain and foot locks, petitioner did not succeed. The two men then fled the scene on their bicycles. Both were arrested within hours; petitioner was found with Gresham's blood on his clothes and Gresham's keys in his pocket. The knife used in the attack and a pistol were discovered nearby. *Ibid.*

Petitioner was charged with malice murder, felony murder, armed robbery, aggravated assault, attempted burglary, and possession of a firearm by a convicted felon. *Id.,* at 774, n. 1, 653 S. E. 2d, at 442, n. 1. A jury found him guilty on all charges and recommended the death penalty. *Ibid.* In particular, the jury unanimously found five aggravating factors: that the murder was committed while petitioner was engaged in an armed robbery; that the murder was committed for the purpose of receiving money or a thing of monetary value; that the murder involved torture; that the murder involved aggravated battery; and that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind. *Id.,* at 781, 653 S. E. 2d, at 447. The trial court agreed with the jury's recommendation and imposed a sentence of death for the malice-murder conviction. The court also imposed a life sentence for armed robbery and consecutive sentences of 20, 10, and 5 years for the remaining convictions. *Id.,* at 774, n. 1, 653 S. E. 2d, at 442, n. 1.

On direct appeal, the Georgia Supreme Court reviewed each statutory aggravating circumstance supporting the death sentence, see Ga. Code Ann. §17–10–35(c)(2) (2008), and struck two of them—murder involving torture and murder involving aggravated battery—because they varied from the applicable statutory language, 282 Ga., at 781, 653 S. E. 2d, at 447; Ga. Code Ann. §17–10–30(b)(7).

With three valid statutory aggravating factors remaining and the full weight of the evidence supporting petitioner's conviction, the Georgia Supreme Court found that petitioner was eligible for the death sentence under state law.

The Georgia Supreme Court then reviewed petitioner's death sentence to determine whether it was "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Ga. Code Ann. §17–10–35(c)(3). The court first determined that the life sentence imposed on Griffin for the same murder did not render petitioner's death sentence disproportionate. Petitioner was more culpable for the murder, and Griffin was ineligible for the death penalty because he was adjudged mentally retarded. *Id.,* at 782, 653 S. E. 2d, 447. The Georgia Supreme Court then examined 21 cases in which a defendant received the death penalty for a "deliberate plan to kill and killing for the purpose of receiving something of monetary value." *Ibid.,* 653 S. E. 2d, 448. After reviewing these cases, the court concluded that petitioner's death sentence was proportional to other death sentences imposed in Georgia and affirmed. *Ibid.*

There is nothing constitutionally defective about the Georgia Supreme Court's determination. Proportionality review is not constitutionally required in any form. Georgia simply has elected, as a matter of state law, to provide an additional protection for capital defendants. *Pulley*, 465 U. S., at 45. In *Pulley*, the Court considered the history of Georgia's capital sentencing scheme and dismissed JUSTICE STEVENS' assertion that the constitutionality of Georgia's scheme had rested on its willingness to conduct proportionality review. *Id.*, at 44–46, 50; *id.*, at 58–59 (STEVENS, J., concurring in part and concurring in judgment). The Court explained that, although it may have emphasized the role of proportionality review as "an additional safeguard against arbitrarily imposed death sentences" in *Gregg*, *supra,* and *Zant*, *supra,* it had never held

that "without comparative proportionality review the [Georgia] statute would be unconstitutional." *Pulley, supra,* at 50. JUSTICE STEVENS acknowledged in his *Pulley* concurrence that his interpretation of *Gregg* and *Zant* differed from the Court's. 465 U. S., at 54. He continues to adhere to his distinctive interpretation of *Gregg* and *Zant* today, *ante,* at 2–3, 6, and questions whether the Georgia scheme as currently administered provides the additional review that he believes is constitutionally required. But, under this Court's precedents, Georgia is not required to provide any proportionality review at all.

Having elected to provide the additional protection of proportionality review, there can be no question that the way in which the Georgia Supreme Court administered that review in this case raised no constitutional issue. The State's proportionality review was lauded in *Gregg* as a protective measure that would ensure that "[i]f a time comes when juries generally do not impose the death sentence in a certain kind of murder case, . . . no defendant convicted under such circumstances will suffer a sentence of death" because there will be no comparable cases to support a finding of proportionality. 428 U. S., at 206 (joint opinion of Stewart, Powell, and STEVENS, JJ.). Then, in *McCleskey,* 481 U. S., at 306, this Court upheld the proportionality review conducted by the Georgia Supreme Court and recognized that the Georgia court's conclusion was supported by "an appendix containing citations to 13 cases involving generally similar murders."[1]

_____

[1] JUSTICE STEVENS accuses the Georgia Supreme Court in this case of engaging in "utterly perfunctory review" because it included "a string citation of 21 cases in which the jury imposed a death sentence" and "ma[de] no reference to the facts of those cases or to the aggravating circumstances found by the jury." *Ante,* at 4. The accusation is entirely without foundation. The proportionality review upheld by this Court in *McCleskey* also contained a string citation of cases that failed to include the detailed discussion of each case's specific facts that JUSTICE

In *McCleskey*, as here, the trial court followed the jury's recommendation and imposed a death sentence for a black defendant who murdered a white victim during an armed robbery. *Id.*, at 283–285; 282 Ga., at 774, 653 S. E. 2d at 442.

JUSTICE STEVENS nevertheless asserts that there is a "special risk of arbitrariness in cases that involve black defendants and white victims," *ante*, at 3, and that the Georgia Supreme Court should have "looked outside the universe of cases in which the jury imposed a death sentence," *ante*, at 4–5. But he once again fails to acknowledge that the Court considered and rejected similar arguments in *McCleskey*, see 481 U. S., at 306–319. The *McCleskey* Court considered whether a study based on Georgia's application of the death penalty in the 1970's showed a "major systemic defec[t]" in sentencing that correlates with race. *Id.*, at 313 (internal quotation marks omitted). And although that study found that the death penalty was imposed more often when a black defendant murdered a white victim than when a white defendant murdered a black victim, *id.,* at 286, the Court concluded that the study "[a]t most . . . indicate[d] a discrepancy that appears to correlate with race," *id.*, at 312. According to the Court, "[a]pparent discrepancies are an inevitable part of our criminal justice system," *ibid.*, and there are other aspects of Georgia's discretionary scheme that could explain the apparent discrepancy, *id.*, at 311–313. The study did not "demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process." *Id.*, at 313.

———————

STEVENS suggests is somehow required by the Constitution. See *McCleskey* v. *State*, 245 Ga. 108, 116–117, 263 S. E. 2d 146, 152 (1980). The only difference between the string citation here and the string citation approved by this Court in *McCleskey* is that the citation here reflects an examination of at least 50% more cases.

The *McCleskey* Court also considered the universe of cases included in the Georgia Supreme Court's proportionality analysis and held that "absent a showing that the Georgia capital punishment system operates in an arbitrary and capricious manner, [a defendant] cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *Id.,* at 306–307 (emphasis in original). The Court in *Gregg* also considered the issue and held that Georgia's scheme would not be ineffective even if, in practice, the Georgia Supreme Court did not consider "nonappealed capital convictions where a life sentence is imposed and cases involving homicides where a capital conviction is not obtained." 428 U. S., at 204, n. 56 (joint opinion of Stewart, Powell, and STEVENS, JJ.).[2] As a result, to the extent that JUSTICE STEVENS suggests that the Court's

—————

[2] In *Gregg*, 428 U. S., at 204, n. 56, the Court noted that the Georgia Supreme Court "has the authority to consider such cases" involving "nonappealed capital convictions where a life sentence is imposed and cases involving homicides where a capital conviction is not obtained" and that it "does consider appealed murder cases where a life sentence has been imposed." Petitioner contends, and JUSTICE STEVENS accepts, that the Georgia Supreme Court no longer considers murder cases where a life sentence has been imposed based on a law review note that studied the proportionality review conducted in 55 capital cases reviewed by the Georgia Supreme Court between 1994 and 2004. *Ante*, at 7; Pet. for Cert. 23 (citing Note, Reviewing the Georgia Supreme Court's Efforts at Proportionality Review, 39 Ga. L. Rev. 631 (2005)). But petitioner and JUSTICE STEVENS do not point to any statement from the Georgia Supreme Court that such cases are no longer considered and there is no reason to believe that the court has changed its practice simply because its decisions do not explicitly cite to cases involving life sentences. See *Pulley* v. *Harris*, 465 U. S., 37, 48, n. 8 (1984) ("[T]he fact that . . . [a] court was not explicit about comparative review does not mean none was undertaken"). Moreover, in this case, the Georgia Supreme Court considered a life sentence in its proportionality review as it explicitly evaluated whether the sentence given Griffin for the same murder made petitioner's death sentence disproportionate.

THOMAS, J., concurring

precedent requires consideration of cases where the death penalty was not imposed, he is simply wrong.

JUSTICE STEVENS' disagreement with this Court's death penalty precedents formed the basis for his dissent from the Court's decision in *McCleskey* and his concurrence in *Pulley*, and he stands by those decisions in his statement today. But *McCleskey*, *Pulley, Zant*, and *Gregg* remain the law. Because the Georgia Supreme Court applied them faithfully and without any error, I concur in the denial of certiorari.